UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MARIA DEL-SOCORRO LAWSON,**<br>Plaintiff,<br><br>vs.<br><br>**TEMPLE AND ASSOCIATES, LLC, et al.,**<br>Defendants. | **2:26-CV-10757-TGB-APP**<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF NO. 11)** |

Plaintiff Maria Del-Socorro Lawson has filed a motion seeking a preliminary injunction requiring Defendants Temple and Associates, LLC ("Temple & Associates"), Holy Creek Non Profit Corporation d.b.a. Melvin T. Walls Manor, and Eric Temple to permit Michael Ward, Lawson's purported caregiver, access to Lawson's residence at Melvin T. Walls Manor. ECF No. 11.

Defendants have responded, ECF No. 13; ECF No. 16, and the Court held an evidentiary hearing on August 3, 2026. For the following reasons, Lawson's motion is **GRANTED**.

## I. BACKGROUND

### 1. Relevant Factual Background

The following factual findings are based on the parties' pleadings, briefings, affidavits and declarations submitted by the parties, and

testimony of witnesses presented at the August 3, 2026 hearing. As the parties have not requested a formal transcript of the hearing, the Court relies on its careful notes and recollection of the testimony presented.

*i. The Parties and the Property*

Plaintiff Maria Del-Socorro Lawson is an 84-year-old woman with multiple disabilities that substantially limit her major life activities. *See* ECF No. 1-2; ECF No. 1, ¶ 7; ECF No. 11-4, PageID.195; August 3, 2026 Hearing ("HRG"). The Social Security Administration has determined that Lawson is disabled. ECF No. 1, ¶ 58. Lawson resides as a tenant of Melvin T. Walls Manor, a low-income, HUD-subsidized housing apartment complex located in Ypsilanti, Michigan. ECF No. 1, ¶ 1; ECF No. 7, ¶ 1. Lawson has resided in Unit 224 of the apartment complex since 2005. ECF No. 1, ¶¶ 1, 59; ECF No. 7, ¶ 59.

The apartment complex is managed by Defendant Temple & Associates. ECF No. 1, ¶ 2; ECF No. 7, ¶ 2. Defendant Eric Temple is a member and principal of Temple & Associates. ECF No. 1, ¶ 3; ECF No. 7, ¶ 3, and works as the Property Manager for Melvin T. Walls Manor, ECF No. 1, ¶ 29; ECF No. 7, ¶ 29.

*ii. Michael Ward*

Michael Ward was also a tenant at Melvin T. Walls Manor, where he occupied his own unit. ECF No. 1, ¶ 13; ECF No. 13, PageID.247. While living there, he became acquainted with Lawson, they became fond of one another, and he began to perform certain caregiving functions for

Lawson. ECF No. 1, ¶ 8; ECF No. 13, PageID.247; HRG. For instance, Ward assists Lawson with transportation, including to medical appointments, communication, medication management, administration of medication, payment of bills, monitoring of blood sugar, and emotional support. ECF No. 1, ¶¶ 62, 79; HRG. Eventually, Ward and Lawson became engaged. HRG.

Ward has a criminal record. In 1981, he was convicted of possession with intent to deliver more than 650 grams of cocaine, and sentenced to life in prison. ECF No. 1, ¶ 9; ECF No. 7, ¶ 9. When the law requiring a life sentence for his offense changed, he was eventually able to attain his release. ECF No. 1, ¶ 10. He is currently on parole and is in compliance with his conditions of release. *Id.*, ¶¶ 10, 12.

*iii. February 12, 2025 Incident*

Lawson stores certain possessions in a storage unit within the apartment complex. HRG.

In October 2024, Lawson was informed by Temple that she needed to empty her storage unit, ECF No. 13-1, PageID.253; HRG, and that the apartment complex does not provide storage units for tenants, ECF No. 1, ¶ 16; ECF No. 7, ¶ 16; ECF No. 13-1, PageID.253; HRG.

On February 12, 2025, Temple inspected Lawson's storage unit. ECF No. 13-1, PageID.253. Lawson alleges, and Ward testified, that during the February 12, 2025 inspection between Lawson and Temple, Temple raised his voice at Lawson. ECF No. 1, ¶ 16; HRG. In agitation,

Lawson called Ward and told him that her possessions would be thrown out. HRG. Ward came to assist Lawson. HRG.

After Ward arrived, Temple and Ward had some sort of dispute or disagreement. HRG; ECF No. 1, ¶¶ 16–20; ECF No. 13-1, PageID.253. Lawson called the police, ECF No. 1, ¶ 19; HRG, and police officers came to the property, ECF No. 1, ¶ 20; ECF No. 7, ¶ 20. The police officers asked to see the security footage, a request which Temple denied. ECF No. 1, ¶ ¶ 20–21, ECF No. 13-1, PageID.253. The police officers then left. ECF No. 13-1, PageID.253; HRG.

The parties present diverging descriptions of this episode.

For their part, Defendants allege that during the encounter, Ward "swung open the stairway door and started intervening in the property manager and Lawson's conversation." ECF No. 13-1, PageID.253. According to Defendants, "Ward started raising his voice as the property manager raised his voice, trying to tell Ward once again not to interfere with another tenant's issues. Ward went into a tirade and started yelling profanity with claims of owning this building when he's done." *Id.* Defendants also allege that Ward "reported the theft of Lawson's 2 containers." *Id.*

Lawson, on the other hand, alleges

> On or about February 12, 2025, Mr. Temple entered the storage unit and asked Ms. Lawson to begin moving her items from her assigned storage. Ms. Lawson did not quite understand Mr. Temple due to limited understanding due to

> her limited English proficiency. Mr. Temple began escalating the discussion and raising his voice at Ms. Lawson, stating that her belongings had to be removed because the apartment complex did not provide storage units for tenants. Mr. Ward, as Ms. Lawson's caregiver, attempted to intervene to assist with communication issues and de-escalate the hostile nature of the conversation from Mr. Temple. Despite Mr. Ward's efforts, Mr. Temple became more aggressive. Ms. Lawson communicated that some of her items had gone missing. Because of the hostile conversation and in an attempt to find out what happened to her belongings, Ms. Lawson called the police. Due to Ms. Lawson's limited English proficiency, Mr. Ward assisted with communication efforts.

ECF No. 1, ¶¶ 14–19.

On February 13, 2025, Ward was issued a warning by Temple & Associates. ECF No. 13-1, PageID.254. The letter states that Temple & Associates had "received a number of complaints from … residents that [Ward had] communicated with, that [Ward had] encouraged them to call the HUD Detroit Field Office and complain." ECF No. 13-1, PageID.254. The letter characterized this behavior as "a blatant act of interference with the Management's operation and the peaceful and enjoyment of other residents." *Id.*

At one point afterwards, Temple issued Lawson and Ward notices of lease violations for clutter. ECF No. 1, ¶ 22; ECF No. 7, ¶ 22.

*iv. July 11, 2025 Notice to Vacate and Subsequent Vacation*

On July 11, 2025, Temple issued Ward a thirty-day notice to vacate the property. ECF No. 13-1, PageID.251.

Accompanying the notice was a letter in which Temple stated that Ward had violated the peace and enjoyment of the residents, had constantly interfered with management and other residents' business, and had failed to keep his unit in a clean, tidy, and pest free condition. *Id.* at PageID.249. Additionally, the letter describes that on June 23, 2025, Temple had entered Ward's unit to conduct maintenance and discovered a foul odor and had found the unit cluttered and unkempt. *Id.* The letter also described that Ward's parole officer had failed to provide Temple with Ward's parole conditions upon Temple's request. *Id.*

The letter identified these "violations" as well as Ward's "parole status and failure to provide the requested information" as "grounds for eviction." *Id.*

On July 17, 2025, the Fair Housing Center of Southeast & Mid Michigan (the "Fair Housing Center") sent Defendants a letter on behalf of Lawson and Ward seeking to halt the notice to quit and summary proceedings and to have Ward continue to assist Lawson with caregiving duties. ECF No. 1, ¶ 25; ECF No. 7, ¶ 25.

Prior to the conclusion of the summary proceedings, Ward and his counsel agreed that he would vacate his unit. ECF No. 1, ¶ 26; ECF No. 7, ¶ 26. Ward vacated his unit. ECF No. 1, ¶ 26; ECF No. 7, ¶ 26. Ward now resides in an apartment complex located nearby Melvin T. Walls Manor. HRG.

During the hearing, Lawson testified that since Ward vacated his

unit in Melvin T. Walls Manor, he called her every morning to remind her to take her insulin, her medicine, and to eat. *Id.* Lawson also testified that Ward similarly called her at lunch and dinner to remind her to take her medicine and to eat. *Id.*

*v. Request for a Reasonable Accommodation*

On October 13, 2025, the Fair Housing Center, acting on Lawson's behalf, submitted a written request for a reasonable accommodation to Temple (the "FHC Letter"). ECF No. 1-7. Specifically, the Fair Housing Center requested that "Melvin T. Walls grant Ms. Lawson's reasonable accommodation request to allow Mr. Ward onto the property without restrictions to assist Ms. Lawson as her primary caregiver." *Id.* at PageID.42.

The FHC Letter detailed that Lawson "requires assistance with daily activities, such as medication administration, housekeeping, transportation, and emotional support" and that "Lawson's fiancé, Michael Ward, provides these services as her primary caregiver." *Id.*

Alongside the FHC Letter, the Fair Housing Center attached a letter from Nurse Practitioner Jennifer Bullard at Sage Medical Consultants. *Id.*

The letter from NP Bullard states that Ward "is not only [Lawson's] fiancé but also serves as her primary caregiver." ECF No. 1-3, PageID.31. The letter states that "Given the crucial role [Ward] plays in [Lawson's] well-being, the restriction on his visitation is potentially harmful to her

health." *Id.* Therefore, NP Bullard "request[ed] that [Lawson] be allowed to have unrestricted access to … Ward as a visitor." *Id.*

On October 14, 2025, Temple denied Lawson's "request for reasonable accommodation". ECF No. 1-8, PageID.44.

On November 17, 2025, Lawson's treating physician, Dr. John Maarouf submitted a letter to Melvin T. Walls Manor. ECF No. 1-11. In that letter, Maarouf states:

> Maria Lawson is my patient, and I am familiar with her medical history and disability-related functional limitations. Mrs. Lawson meets the definition of disability under the Fair Housing Act.
>
> Due to Mrs. Lawson's physical disability, it is necessary that she has daily, unrestricted assistance from her primary caregiver, Michael Ward. Mr. Ward assists Mrs. Lawson with her disability-related needs, such as administering her medications, monitoring her blood sugar levels, and accompanying her to all doctor and rehabilitation appointments.
>
> Mr. Ward is also Mrs. Lawson's fiancé and provides essential social and emotional support that contributes to her overall health and happiness.
>
> For these reasons, it is necessary that Mr. Ward be permitted to enter the property et Melvin T. Walls Manor to care for Mrs. Lawson at her apartment as a reasonable accommodation of her disability.

*Id.* at PageID.48.

On December 19, 2025, Lawson's counsel sent Temple a demand letter renewing the request that Ward be permitted to access the

premises and Lawson's unit "for the purpose of serving as our client's caregiver" and that Temple "[r]escind any trespass notice, restriction, or informal ban imposed against him." ECF No. 1-12, PageID.49–50. The letter states that "Allowing our client's primary caregiver to access her unit is a textbook reasonable accommodation. Blanket exclusions based on criminal history—particularly when applied to a former resident caregiver—are legally insufficient and discriminatory." *Id.* at PageID.50.

On December 24, 2025, Temple responded. ECF No. 1-13. In the response, Temple stated that Temple & Associate's "position remains unchanged in reference to the approval of Michael Ward" and that "we will not approve Mr. Ward's entry to our property." *Id.* at PageID.52. Defendants also note Ward's "persistence in attempting to re-enter our building, and the complaints we received from our current residents about him questioning them at the bus stop after his eviction" and characterize this behavior as "harassment." *Id.*

As of the date of this Order, the requested accommodation has not been granted.

*vi. Defendants' Allegations Surrounding Ward's Conduct*

Defendants maintain that they have not objected to Lawson having a caregiver. ECF No. 7, ¶¶ 65, 72. Instead, Defendants explain that they only object to allowing Ward, because of his previous conduct, being on the property. *Id.*, ¶ 65. Defendants also state that "Ward was notified that he was not welcome on the property, but he was never served a

trespass notice." *Id.*, ¶ 27.

In Defendants' response to the present motion, Defendants state that they are "willing to cooperate with a reasonable accommodation for Ms. Lawson, but requesting specifically Michael Ward is not reasonable given his history at Melvin T. Walls Manor." ECF No. 13, PageID.247. In their answer, Defendants state that "Ward is not welcome on the property for his criminal background among other reasons listed in Defendant's letter." ECF No. 7, ¶ 80.

Defendants characterize Ward as a "disruptive presence" who "constantly interfere[ed] with management, proposition[ed] other tenants, and fail[ed] to keep his unit in the clean conditions required by his lease." *Id.*

Additionally, Defendants provide a letter from another tenant who voiced concern that Lawson was being "abused by" Ward. ECF No. 13-2, PageID.255. The letter also noted that Lawson was hospitalized while in the care of Ward. *Id.*

During the August 3, 2026 hearing, Temple testified that Ward was a disruptive tenant who was bothering other tenants. HRG. Temple also testified that Ward was controlling of Lawson and told her what to do. *Id.* Temple testified that other tenants had shared this observation. *Id.* Temple also maintained that Lawson's health improved and that she had become more social after Ward was excluded from the complex. *Id.*

Temple also testified that Lawson used certain racist epithets

towards staffers. *Id.* Temple testified that he attributed Lawson's use of these racist epithets to Ward. *Id.* Additionally, Temple testified that notes containing racist epithets were found on Lawson's door and that he suspected Ward's involvement. *Id.*

During the hearing, Lawson's daughter, Martha Leticia Ciavatonne, testified that she had no indication that her mother was being abused. *Id.* She also testified that her mother has affirmatively stated that she has not been abused by anyone. *Id.*

During the hearing, the Court asked Lawson whether she wanted Ward to provide her with assistance. *Id.* Lawson testified affirmatively. *Id.* The Court asked Lawson whether Ward had ever hurt her. *Id.* Lawson responded, "Never, never, never." *Id.*

Throughout the hearing, Lawson and Ward expressed their love and deep affection for one another. *Id.* With tears in her eyes, Lawson expressed her need for Ward's care. *Id.* Ward, for his part, stated that he felt that his life's purpose was to care for Lawson. *Id.*

*vii. Medical Evidence*

Lawson was hospitalized twice in February 2026. ECF No. 11-4; ECF No. 11-5. Lawson alleges that after one of these hospitalizations, she was discharged to Ward's apartment "due to her insurance company's denial of discharge to a skilled nursing care for rehabilitation due to lack of a caregiver." ECF No. 1, ¶ 67. Lawson alleges that although "Ward provided care to Ms. Lawson at his apartment" Lawson was

"uncomfortable and prefers to be in her own apartment." *Id.*, ¶ 68.

Lawson has submitted declarations from multiple treating physicians.

Lawson submits a July 1, 2026 declaration from Dr. John Maarouf. ECF No. 11-2. Dr. Maarouf declares that

> I have treated Plaintiff, Maria Del-Socorro Lawson ("Ms. Lawson"), and am familiar with her medical history, diagnoses, functional limitations, treatment, and ongoing medical needs.
>
> Ms. Lawson suffers from medical conditions and disabilities that substantially limit one or more major life activities, including her ability to safely care for herself without assistance.
>
> As her treating physician, I have determined, within a reasonable degree of medical certainty, that Ms. Lawson requires the assistance of her caregiver, Michael Ward ("Mr. Ward"), to regularly assist her in order for her to safely reside in her home and manage her medical conditions.
>
> Mr. Ward's service as a caregiver is medically necessary to assist Ms. Lawson with, among other things:
>
> - Timely administration and monitoring of prescribed medications;
> - Assistance with activities of daily living necessitated by her medical conditions;
> - Monitoring changes in her physical condition and responding appropriately to medical
> - emergencies;
> - Coordinating and facilitating necessary medical treatment and follow-up care; and
> - Providing ongoing supervision necessary to reduce the risk of serious injury or medical complications;

> In my professional opinion, Ms. Lawson's need for a caregiver familiar with her treatment plan is medically necessary and are not merely matters of convenience or personal preference.
>
> Mr. Ward regularly accompanies Ms. Lawson to her appointments and participates in her treatment and care, and is also Ms. Lawson's desired caregiver.
>
> In my professional medical opinion, allowing Mr. Ward to serve as Ms. Lawson's caregiver is necessary to allow her to safely remain in her residence.
>
> I previously prepared and authorized medical documentation recommending that Ms. Lawson be permitted to have Mr. Ward serve as her caregiver with unrestricted access to assist her in her residential unit as a reasonable accommodation for her disabilities.
>
> Without allowing Mr. Ward to serve as caregiver, Ms. Lawson faces a significantly increased risk of adverse medical consequences including missed medications, deterioration of her medical condition, unnecessary hospitalization, inability to appropriately respond to medical emergencies, and the loss of her ability to safely remain in her housing.
>
> Since the requested accommodation has been denied, I understand that Ms. Lawson has experienced serious medical complications, requiring hospitalization on more than one occasion.
>
> All opinions expressed in this Declaration are made within a reasonable degree of medical certainty and are based upon my personal knowledge, treatment of Ms. Lawson, review of her medical records, and my education, training and experience.

*Id.* at PageID.191–92 (paragraph numeration omitted).

Next, Lawson submits a July 7, 2026 declaration from Dr. Samuel Lidsky. ECF No. 11-3. Dr. Lidsky declares that

I have treated Plaintiff, Maria Del-Socorro Lawson ("Ms. Lawson"), and am familiar with her medical history, diagnoses, functional limitations, treatment, and ongoing medical needs.

Ms. Lawson suffers from medical conditions and disabilities that substantially limit one or more major life activities, including her ability to safely care for herself without assistance.

As her treating physician, I have determined, within a reasonable degree of medical certainty, that Ms. Lawson requires the assistance of her caregiver, Michael Ward ("Mr. Ward"), to regularly assist her in order for her to safely reside in her home and manage her medical conditions.

Mr. Ward's service as a caregiver is medically necessary to assist Ms. Lawson with, among other things:

- Timely administration and monitoring of prescribed medications;
- Assistance with activities of daily living necessitated by her medical conditions;
- Monitoring changes in her physical condition and responding appropriately to medical emergencies;
- Coordinating and facilitating necessary medical treatment and follow-up care; and
- Providing ongoing supervision necessary to reduce the risk of serious injury or medical complications;

Mr. Ward regularly accompanies Ms. Lawson to her appointments and participates in her treatment and care, and is also Ms. Lawson's desired caregiver.

In my professional medical opinion, allowing Mr. Ward to serve as Ms. Lawson's caregiver is necessary to allow her to safely remain in her residence.

Not allowing Mr. Ward to serve as Ms. Lawson's caregiver, likely contributed to past hospitalizations, and causes an

> undue risk of future hospitalizations.
>
> Caregiver support is essential to Ms. Lawson's ability to live independently.
>
> All opinions expressed in this Declaration are made within a reasonable degree of medical certainty and are based upon my personal knowledge, treatment of Ms. Lawson, review of her medical records, and my education, training and experience.

*Id.* at PageID.194.

Additionally, during the August 3, 2026 hearing, Lawson's daughter, Martha Leticia Ciavatonne, testified that Ward's emotional connection with her mother made him uniquely qualified to be her caregiver. HRG. Lawson's daughter specifically stated that there is "no one else" that can assist her mother. *Id.*

Since Ward has been unable to enter the apartment complex, Lawson's medication has been transferred through another resident. ECF No. 11, PageID.153; HRG.

Defendants deny that it is necessary for Lawson to have Ward serve as her caregiver. ECF No. 7, ¶¶ 17, 23. Additionally, Defendants argue that "Ward is not uniquely qualified and Plaintiff has not demonstrated that her need for a caregiver necessarily requires … Ward to serve in that capacity." ECF No. 13, PageID.247. However, beyond attorney argument, Temple's testimony, and a letter from another tenant, Defendants have provided no independent medical evidence that challenges the opinions expressed in the doctors' affidavits that Ward's service as a caregiver is

medically necessary for Lawson.

**2. Procedural History**

Lawson initiated suit on March 6, 2026. ECF No. 1. Lawson brings following counts: (I) Violations of the Fair Housing Amendment Act (FHAA); and (II) Violations of Michigan's Persons with Disabilities Civil Rights Act (PWDCRA). *Id.*

On June 22, 2026, Defendants filed their answer. ECF No. 7.

On July 21, 2026, Lawson filed a motion for a temporary restraining order and preliminary injunction. ECF No. 11. In relevant part, Lawson requests that this court enter injunctive relief requiring Defendants to permit Ward to access Lawson's residence and the common areas of Melvin T. Walls Manor for the limited purposed medically necessary caregiving services. ECF No. 11, PageID.154.

On July 22, 2026, the Court held a telephonic status conference.

On July 27, 2026, Defendants responded to Lawson's motion. ECF No. 13.

On July 29, 2026, the Court granted Lawson's motion for a temporary restraining order. ECF No. 15. Specifically, the Court ordered

> that the Defendants shall permit Michael Ward temporary access to Plaintiff's residence and the common areas of Melvin T. Walls Manor for the limited purpose of providing medically necessary caregiving services; that the Defendants are enjoined from interfering with Plaintiff's receipt of medically necessary caregiving services from Michael Ward during the pendency of this action until August 3, 2026, when a hearing

> on the motion for a preliminary injunction will be held; and that Defendants are enjoined from retaliating against Plaintiff or Michael Ward based on Plaintiff's request for a reasonable accommodation.

*Id.* at PageID.258–59. The Court also ordered

> based on Defendants' representations during the July 22, 2026 status conference and in consideration of Defendants' July 27, 2026 Response to the Motion for Temporary Restraining Order, ECF No. 13, that Michael Ward shall abide by the rules and regulations of Melvin T. Walls Manor, as well as all local, state, and federal laws during his visits to provide of caregiving services to Plaintiff, and that the length of Mr. Ward's visits to Plaintiff shall be limited to the period of time needed to provide medically necessary caregiving services only. If either party becomes aware of any violation of the terms of this Order, that party should notify the Court so that appropriate action may be taken.

*Id.* at PageID.259.

On August 3, 2026, the Court held an evidentiary hearing on the motion for preliminary injunction. During that hearing, the parties agreed that the Temporary Restraining Order would stay in effect until resolution of Lawson's motion for a preliminary injunction. The Court also ordered the parties to meet-and-confer by August 10, 2026 to discuss whether they could resolve the motion for a preliminary injunction amicably.

On August 10, 2026, Defendants filed a supplementary brief. ECF No. 16. In that brief, Defendants state that "[i]f the Court continues the Temporary Restraining Order/Preliminary Injunction, it must be clearly

stated that the limits on time, place, and conduct are not guidelines and are not optional. The Defendants propose that Ms. Lawson's "medical caregiver" provide his help, advice, support, and transportation from his nearby apartment." *Id.* at PageID.261.

On the same day, Defendants also submitted suggested language for the Court's injunctive relief. *See* ECF No. 16-1.

## II. STANDARD OF REVIEW

Lawson filed this motion pursuant to Federal Rule of Civil Procedure 65, requesting, in relevant part, that the Court grant a preliminary injunction, requiring Defendants "to permit Michael Ward access to Plaintiff's residence and the common areas of Melvin T. Walls Manor for the limited purpose of providing medically necessary caregiving services." ECF No. 11, PageID.154.

Courts consider four factors when determining whether to grant a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 371 (6th Cir. 2025). The Sixth Circuit has "often cautioned that these are factors to be balanced, not prerequisites to be met." *Doe v.*

*Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (citation omitted) ("*Univ. of Cincinnati*"). At the same time, the Sixth Circuit has "also held that a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Id.* (cleaned up). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III. DISCUSSION

### 1. Whether Lawson Has a Strong Likelihood of Success on the Merits

The first factor that the Court must consider is whether Lawson "has demonstrated a strong likelihood of success on the merits." *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 121 (6th Cir. 2019) (citation omitted). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). To meet his burden, Lawson "must show more than a mere possibility of success." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citation omitted).

Lawson alleges that Defendants violated the FHAA and the PWDCRA. ECF No. 1. Lawson's claim is the same under both statutes: that Lawson is a person with a disability; that Defendants unlawfully

denied her request for a reasonable accommodation; and that such denial was in violation of the FHAA and PWDCRA. *Id.*, ¶¶ 84–95. Discrimination under PDCRA parallels the language of the FHAA, so the claims will be examined together. *Rogan v. Chateaufort Place Coop., Inc.*, No. 25-12443, 2026 WL 1804154, at *2 (E.D. Mich. June 23, 2026) (Goldsmith, J.). Additionally, the "the requirements for reasonable accommodation under the ADA are the same as those under the FHAA." *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 21-3090, 2021 WL 5411220, at *6 (6th Cir. Nov. 19, 2021) (cleaned up).

"The FHAA makes it unlawful to 'discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap.'" *Anderson v. City of Blue Ash*, 798 F.3d 338, 360 (6th Cir. 2015) (quoting 42 U.S.C. § 3604(f)(2)). Discrimination includes "'refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.'" *Id.* (quoting § 3604(f)(3)(B)). Under the Sixth Circuit's case law, courts focus on "whether the proposed accommodation is reasonable and whether it is necessary to afford disabled persons an equal opportunity for enjoyment." *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 540 (6th Cir. 2014).

To state a reasonable-accommodation claim under the FHAA,

Lawson must show that (i) she had a disability as defined by the FHAA, (ii) she requested an accommodation, (iii) the Defendants refused to permit it, (iv) the Defendants knew or should have known of her disability, and (v) the requested accommodation was reasonable and necessary. *Id.* at 541.

Defendants' response brief fails to engage with these elements. ECF No. 13. Instead, Defendants argue that (1) Defendants "never objected to Ms. Lawson's request for a caregiver but rather that they have reasonably and justifiably objected to specifically Michael Ward being selected as her caregiver"; (2) Defendants had "valid concerns about Mr. Ward returning to the building."; (3) "Plaintiff's motion repeatedly equates Plaintiff's need for caregiving with Plaintiff needing Michael Ward specifically for said caregiving services."; and (4) "If Plaintiff would explore her options of an alternative qualified individual serving as her caregiver, Defendants would consider such a request in good faith." ECF No. 13, PageID.246–48. These arguments map onto the fifth element of a reasonable-accommodation claim under the FHAA: that the requested accommodation was reasonable and necessary.

In any case, the Court examines each element in turn.

*i. Whether Lawson had a disability as defined by the FHAA*

The Fair Housing Act refers to a disability as a "handicap" and defines a "handicap"

1) a physical or mental impairment which substantially

limits one or more of such person's major life activities,
2) a record of having such an impairment, or
3) being regarded as having such an impairment,

42 U.S.C. § 3602 (h).

Here, Lawson submits declarations from two of her treating physicians. Both of these doctors attest that Lawson "suffers from medical conditions and disabilities that substantially limit one or more major life activities, including her ability to safely care for herself without assistance." ECF No. 11-2, PageID.191–92; ECF No. 11-3, PageID.194.

Based on this medical evidence, as well as the evidence introduced at the hearing, the Court concludes that Lawson has a very strong likelihood of proving that she has a disability.

*ii. Whether Lawson requested an accommodation*

On July 11, 2025, Temple issued Ward a thirty-day notice to vacate the property. ECF No. 13-1, PageID.251. After Ward vacated the property, Ward was denied access to the property by Defendants. ECF No. 7, ¶ 65.

On October 13, 2025, the Fair Housing Center, acting on Lawson's behalf, requested that "Melvin T. Walls grant Ms. Lawson's reasonable accommodation request to allow Mr. Ward onto the property without restrictions to assist Ms. Lawson as her primary caregiver." ECF No. 1-7, PageID.42.

On November 17, 2025 and on December 19, 2025 Lawson issued

similar requests. ECF No. 1-11; ECF No. 1-12, PageID.49–50.

Accordingly, based on the evidence before the Court today, the Court concludes that Lawson has shown a very strong likelihood that she requested an accommodation.

*iii. Whether Defendants Refused to Permit Lawson's Requested Accommodation*

Defendants refused Lawson's requested accommodation—that Ward be allowed onto the property to assist Lawson as her caregiver, *see, e.g.*, ECF No. 1-7, PageID.42—on multiple occasions. For instance, on October 14, 2025, Temple denied Lawson's "request for reasonable accommodation". ECF No. 1-8, PageID.44. Temple reiterated their position on December 24, 2025. ECF No. 1-13, PageID.52. As of the date of this Order, the requested accommodation has not been granted.

Accordingly, based on the evidence before the Court today, the Court concludes that Lawson has shown a very strong likelihood that Defendants refused Lawson's request for an accommodation.

*iv. Whether Defendants Knew or Should Have Known of Lawson's disability*

Lawson submits a letter from Dr. Maarouf, dated November 17, 2025, submitted to Defendants. ECF No. 1-11. In that letter, Dr. Maarouf references Lawson's "disability-related functional limitations" and her "physical disability." *Id.* at PageID.48.

Additionally, the Court observed Lawson during the August 3, 2026

hearing.

Based on this evidence, the Court concludes that Plaintiff has shown by a very strong likelihood that Defendants knew or should have known of Lawson's disability.

*v. Whether Lawson's requested accommodation was reasonable and necessary*

"An accommodation is reasonable when it imposes no fundamental alteration in the nature of the program or undue financial and administrative burdens." *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (citation omitted).

Additionally, "to prove that an accommodation is necessary, plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Id.* (cleaned up). A plaintiff's requested accommodation is not necessary when the defendant offered other reasonable accommodations that would ameliorate a plaintiff's disabilities and the plaintiff refuses such accommodations. *Phillips v. Acacia on the Green Condo. Ass'n, Inc.*, No. 20-4182, 2022 WL 1692948, at *3 (6th Cir. May 26, 2022).

The Court finds that based on the evidence before it, Lawson's requested accommodation—that Ward be allowed onto the property to assist Lawson as her caregiver—has been shown by a strong likelihood to be both necessary and reasonable.

First, Lawson submits a declaration from her treating physician,

Dr. John Maarouf, who "determined, within a reasonable degree of medical certainty, that … Lawson requires the assistance of her caregiver… Ward …, to regularly assist her in order for her to safely reside in her home and manage her medical conditions." ECF No. 11-2, PageID.191. Dr. Maarouf specifically declares that Ward's service as a caregiver is medically necessary to assist Lawson with, among other things:

- Timely administration and monitoring of prescribed medications;
- Assistance with activities of daily living necessitated by her medical conditions;
- Monitoring changes in her physical condition and responding appropriately to medical emergencies;
- Coordinating and facilitating necessary medical treatment and follow-up care; and
- Providing ongoing supervision necessary to reduce the risk of serious injury or medical complications;

*Id.* at PageID.191–92.

Second, Lawson submits a declaration from her other treating physician, Dr. Samuel Lidsky, who "determined, within a reasonable degree of medical certainty, that … Lawson requires the assistance of her caregiver, … Ward …, to regularly assist her in order for her to safely reside in her home and manage her medical conditions. ECF No. 11-3, PageID.194. Dr. Lidsky specifically declares that Ward's service as a caregiver is medically necessary to assist Lawson with, among other things:

- Timely administration and monitoring of prescribed medications;
- Assistance with activities of daily living necessitated by her medical conditions;
- Monitoring changes in her physical condition and responding appropriately to medical emergencies;
- Coordinating and facilitating necessary medical treatment and follow-up care; and
- Providing ongoing supervision necessary to reduce the risk of serious injury or medical complications;

*Id.* at PageID.194.

Third, Lawson introduced evidence during the August 3, 2026 hearing, including through her own testimony, that she depends on Ward for assistance with her medication, to remind her to eat, and to help her move, including to medical appointments, among other things. HRG. Additionally, Lawson appears to depend on Ward for emotional and social support.

In response, Defendants argue that "Plaintiff's motion repeatedly equates Plaintiff's need for caregiving with Plaintiff needing Michael Ward specifically for said caregiving services" and that Lawson should "explore her options of an alternative qualified individual serving as her caregiver." ECF No. 13, PageID.246–48. In other words, Defendants argue that another reasonable accommodation—which they would not object to—is available: that Lawson be provided caregiving services by another caregiver.

The Court disagrees.

First, the uncontroverted medical evidence indicates that it is *specifically Ward*'s service as a caregiver that is medically necessary. For instance, Dr. Maarouf attests that Lawson needs "a caregiver familiar with her treatment plan" and that this need is not "merely [a] matter[] of convenience or personal preference." ECF No. 11-2, PageID.192. Additionally, both Dr. Maarouf's and Dr. Lidsky's declarations specifically state that Ward's caregiving services are medically necessary. *Id.*; ECF No. 11-3. In response, Defendants have introduced no medical evidence stating that Lawson's medical needs could be met through an alternative caregiver unfamiliar with her treatment plan. Given that the medical evidence before the Court specifically states that Ward's caregiving services are medically necessary, the Court will not speculate whether a hypothetical alternative caregiver could meet Lawson's medical needs.

Second, during the August 3, 2026 hearing, Lawson's daughter, Martha Leticia Ciavatonne, testified that *only* Ward could fulfill her mother's medical needs. HRG. The Court also observed Lawson's testimony during the hearing and concludes that Lawson specifically depends on Ward for her emotional and physical well-being. *Id.*

Third, there is no evidence in the record that Lawson has the financial means necessary to find another caregiver who provides the same quality of care as Ward, who offers his around-the-clock caregiving services to Lawson for free, HRG. Additionally, Lawson's insurance

company appears to not be willing to pay for a caregiver. ECF No. 1, ¶ 67 (Lawson alleges that after one of these hospitalizations, she was discharged to Ward's apartment "due to her insurance company's denial of discharge to a skilled nursing care for rehabilitation due to lack of a caregiver.").

Accordingly, the Court concludes that, based on the evidence before it, Defendants suggested alternative—providing a different caregiver—is not feasible, nor would such an alternative caregiver be able to meet Lawson's medical needs.

Next, Defendants argue that they have "valid concerns about Mr. Ward returning to the building." ECF No. 13, PageID.247. In their supplementary brief, Defendants highlighted the discomfort of other residents upon seeing Ward and "the racial tenor of Mr. Ward's interactions with residents and staff." ECF No. 16, PageID.260. In other words, Defendants are challenging the reasonableness of Lawson's requested accommodation.

The Court is sensitive to Defendants' objection to Ward's presence in the apartment complex. However, the Court concludes that allowing Ward to enter the apartment complex for the sole purpose of fulfilling his caregiving services to Lawson will not place undue financial or administrative burdens on Defendants. Thus, such accommodation is reasonable.

Additionally, the Court notes that on July 29, 2026, the Court

ordered

> that Michael Ward shall abide by the rules and regulations of Melvin T. Walls Manor, as well as all local, state, and federal laws during his visits to provide of caregiving services to Plaintiff, and that the length of Mr. Ward's visits to Plaintiff shall be limited to the period of time needed to provide medically necessary caregiving services only. If either party becomes aware of any violation of the terms of this Order, that party should notify the Court so that appropriate action may be taken.

ECF No. 15, PageID.259. Since the Court's July 29, 2026 Order went into effect, neither party has notified the Court that these terms have been violated. In other words, Ward's course of conduct since July 29, 2026 appears to indicate that Lawson's requested accommodation would not place undue financial or administrative burdens on Defendants.

Thus, the Court concludes that, based on the evidence before it, the record demonstrates a strong likelihood that Lawson's requested accommodation—that Ward be allowed onto the property to assist Lawson as her caregiver—is both necessary and reasonable.

*vi. Conclusion*

Accordingly, the Court finds that, based on the evidence before it, Lawson is likely to succeed on every element of her reasonable-accommodation claim under the FHAA and the PWDCRA.

Thus, Lawson has shown that she is likely to succeed on the merits of her FHAA and PWDCRA claims. This factor weighs in favor of

injunctive relief.

### 2. Whether Lawson Would Suffer Irreparable Harm Absent an Injunction

"The second factor … asks whether the movant is likely to suffer irreparable harm in the absence of the injunction." *Univ. of Cincinnati*, 872 F.3d at 407.

The Court concludes that, based on the evidence before the Court, Lawson will suffer irreparable harm if Ward is no longer able to access her residence to provide caretaking services.

First, as detailed above, the record before the Court shows that Ward's caretaking services are medically necessary to Lawson.

Second, Lawson has submitted medical evidence that indicates that during the period in which Ward was unable to access Lawson's residence, Lawson has experienced serious medical complications. Namely, Dr. Maarouf declared that "[s]ince the requested accommodation has been denied, I understand that Ms. Lawson has experienced serious medical complications, requiring hospitalization on more than one occasion." ECF No. 11-2, PageID.192. Additionally, Dr. Lidsky declared that "[n]ot allowing Mr. Ward to serve as Ms. Lawson's caregiver, likely contributed to past hospitalizations, and causes an undue risk of future hospitalizations" and that "Caregiver support is essential to Ms. Lawson's ability to live independently." ECF No. 11-3, PageID.194.

Third, since Ward has been unable to enter the apartment complex, Lawson's medication has been transferred through another resident. ECF No. 11, PageID.153; HRG. Depending on other residents to transfer medication introduces significant risks that Lawson would lose access to her medicine.

In response, Defendants argue that "[t]here is no irreparable harm in denying Plaintiff's motion. Plaintiff is already receiving medical treatment and has the option of seeking caregiving from alternative individuals and/or services." ECF No. 13, PageID.248.

The Court disagrees. First, Lawson does not appear to have the resources to seek alternative caregiving. Second, Lawson's treating physicians specifically name Ward's caregiving services as medically necessary. Third, Lawson's treating physicians attested that the medical treatment Lawson received during the period that Ward was unable to access her residence was a cause of her hospitalizations.

Defendants also point out that "[a] neighbor reported that he had been hearing loud noises and commotion in Plaintiff's unit and his incident report specifically points out that Ms. Lawson had been injured and been hospitalized while she was under Mr. Ward's care." ECF No. 13, PageID.248.

However, when weighed against the medical evidence and the evidence introduced at the hearing from Lawson that Ward has been a positive, not a harmful caregiver, a neighbor's letter in which he

speculates on the case of Lawson's hospitalizations is of little evidentiary value.

Thus, the Court finds that the record supports the conclusion that Lawson would suffer irreparable harm absent an injunction. Accordingly, this factor weighs in favor of granting preliminary relief.

**3. Whether Issuance of the Injunction Would Cause Substantial Harm to Others & Whether the Public Interest Would Be Served by the Issuance of the Injunction**

"The third factor we must consider is whether the issuance of the injunction would cause substantial harm to others." *Handel's Enters., Inc.*, 765 F. App'x at 125. The fourth factor we must consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551 (citation omitted). Courts frequently consider these two factors together. *See*, *e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001).

Defendants argue that

> Granting Plaintiff's motion would require that Defendants admit a disruptive individual back into the building, recreating the circumstances that necessitated Mr. Ward's removal in the first place. Allowing Mr. Ward to return to Melvin T. Walls Manor would not be in the best interest of the building's management, of its other residents, or even potentially of Plaintiff.

ECF No. 13, PageID.248.

The Court is sympathetic to these concerns, but finds that

conditions can be fashioned to protect the interests of the Melvin T. Walls Manor.

Defendants introduced evidence that Ward was as a "disruptive presence" who "constantly interfere[ed] with management, proposition[ed] other tenants, and fail[ed] to keep his unit in the clean conditions required by his lease." ECF No. 7, ¶ 80; HRG. Temple also testified that he believed Ward was responsible for certain racist remarks directed towards the apartment complex's staffers. HRG.

Additionally, having observed Ward's and Temple's respective behavior and demeanor during the hearing, it was understandable how the two men may have clashing personalities and a history of conflict with one another. There was evidence that some residents may find Ward's presence in complex to be disruptive or uncomfortable.

Furthermore, "the right to exclude others" is a "a fundamental element of the property right." *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979).

However, the Court finds that the harm—if any—caused by Ward's access to Lawson's residence to perform caregiving services can be managed and ameliorated through narrowly tailored injunctive relief. Such narrowly tailored injunctive relief will minimize any negative aspects to other residents, or to the public, that could arise from allowing Ward access to Lawson's residence.

As mentioned above, since July 29, 2026, such narrowly tailored

injunctive relief has been in place. ECF No. 15. Since then, apparently, Ward has shown that he is able and willing to abide by the constraints of the Court's injunctive relief. Neither party has raised any evidence that Ward's access to Lawson's residence over the past three weeks has caused any disruption or harm to any other residents.

Furthermore, the Court concludes that allowing a disabled elderly woman access to her caregiver, who is uniquely qualified to provide her with caregiving services, outweighs the marginal harm of constraining Defendants' right to exclude Ward.

Thus, the Court finds that issuing a narrowly tailored injunction would not cause substantial harm to others and that the public interest would be served by the issuance of the injunction. Accordingly, these two factors weigh in favor of granting preliminary relief.

**4. Conclusion**

The Court concludes that Lawson has demonstrated a substantial likelihood of success on the merits, a likelihood that denial of the preliminary injunction would cause her irreparable harm, that issuance of the injunction would not cause substantial harm to others, and that the public interest would be served by the issuance of the injunction. Thus, all four factors considered by Courts when determining whether to grant a preliminary injunction weigh in favor of injunctive relief.

Thus, the Court concludes that injunctive relief is warranted.

## IV. CONCLUSION

For the reasons stated above, Lawson's motion for a preliminary injunction (ECF No. 11) is **GRANTED**.

It is hereby **ORDERED** that the Defendants shall permit Michael Ward temporary access to Plaintiff Maria Del-Socorro Lawson's apartment located at Melvin T. Walls Manor as necessary for the limited purpose of providing medically necessary caregiving services to Plaintiff; that such temporary access includes the common areas of Melvin T. Walls Manor only to the extent necessary to permit access to Plaintiff's apartment; that the Defendants are enjoined from interfering with Plaintiff's receipt of medically necessary caregiving services from Michael Ward during the pendency of this action; and that Defendants are enjoined from retaliating against Plaintiff or Michael Ward based on Plaintiff's request for a reasonable accommodation.

**IT IS FURTHER ORDERED,** that Michael Ward shall cooperate with the staff of Melvin T. Walls Manor, abide by its rules and regulations, as well as all local, state, and federal laws during his visits to provide of caregiving services to Plaintiff, and that the length of Mr. Ward's visits to Plaintiff shall be limited to the period of time needed to provide medically necessary caregiving services only. If either party becomes aware of any violation of the terms of this Order, that party should notify the Court so that appropriate action may be taken.

**IT IS FURTHER ORDERED,** that Michael Ward's interactions

with Melvin T. Wall Manor's staff or other residents shall be limited to contacts that are directly necessary for Plaintiff's medical care and for no other purpose.

**SO ORDERED.**

Dated: August 18, 2026

s/Terrence G. Berg
HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE